3-27-2020

The Honorable Judge Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street, Room 2240
New York, NY 10007

Re: Ahmad Mohammad Ajaj v. United States of America, Case No. 16-cv-5031 (LAK)

Dear Judge Kaplan:

I respectfully writing regarding the following issues:

1. To request that the Court direct the Public Defender Attorney Robert Baum to withdraw from my case because:

a) conflict of interest due to the fact he also representing my co-defendants, including ones that cooperated with government;

b) SINCE he appointed to represent me, he never spoke to me, conferred with me before filing anything on my behalf, or sent me a draft of anything he filed in my case before filing it with the Court to give me the opportunity to first review such filing and add any claim or argument relevant to my § 2255;

c· failed to inform the Court of my request for full resentence as required by United States v. Davis, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019)("in response, the government conceded that if §924(c)(3)(B) is held to be vague, then the defendants are entitled to a full resentencing, not justthe more limited remedy the court had granted them"); and

d) failed to raise arguments relevant only to my case, but not for my co-defendants, including the fact, unlike my co-defendants my conviction of Count 9 and all other counts were based on Pinkerton liability. See, United States v. Salameh, 152 F.3d 88, 149-150 (2d Cir. 1997)(the district court instructed the Jury "Ajaj could be found guilty of the substative crime only after the jury had concluded that he was conspirator").

2. To appoint new Attorney to represent me and to seek a full resentence on my behalf and to raise relevant arguments to my case that Mr. Baum failed to raise.

3. If your Honor will deny my request for appointment of new counsel to represent and prepare for a full resentence on my behalf, then the Court should give me (60) days of extension of time to file a pro se reply to the government's response to the Court's Order, dated 2-19-2020, because:

a) The extension of time is necessary to enable me to find an inmate knowledgeable criminal law, who is willing to help me prepare response to government's recent

-1-

filing and to help me with any necessary filings related to my own case;

b) Due to COVID-19, USP-Allenwood completely restricted contacts between inmates housed in different units and imposed other restrictions that will make it difficult for me to find a fellow inmates to help me because currently no one in my Unit knows the criminal law to help me; and

c) due to my chronic health problems, including the removal of my left lung due cancer and severe spinal disorder, these health problems also interfer with ability to prepare pro se filings if no inmate is found to help in a timely manner.

Thank you for your consideration of this matter.

Respectfully submitted,

Ahmad Mohammad Ajaj
#40637-053
USP-Allenwood
P.O.Box 3000
White Deer, PA 17887

Note: due to lack of access to a copy-machine, I am unable to send copies of this letter to Mr. Robert Baum and the AUSA Juliana N. Murray. Any way they will served with this letter through the Electronic Filings System of the Court.

-2-

**The New York Times**   https://nyti.ms/298EfN4

ARCHIVES | 1994

# Evidence Re-examined: A special report; Questions Raised In One Conviction In Blast at Towers

By RICHARD BERNSTEIN

All through his trial in the World Trade Center bombing case, it was clear that Ahmad M. Ajaj was in a different category from his three co-defendants. Unlike the others, he could not have been part of the actual bombing, since he was in prison at the time. Furthermore, there was no evidence that he had even previously known any of the other men on trial.

But the Government convinced the jury that Mr. Ajaj -- who did not testify in his own behalf -- had played a role in the early stages of the conspiracy, helping, in the prosecution's version of events, the mastermind to get into the country with military manuals. After the jury returned its guilty verdict, he was sentenced as an equal partner with the others -- to 240 years in prison.

Mr. Ajaj is now preparing an appeal, and has decided to do what he did not do during the trial: to tell his story. Not surprisingly, he maintains that he is innocent in what is called the worst terrorist assault ever on American soil.

To Government prosecutors, any story that Mr. Ajaj tells now -- a story that, unlike the one told in court, cannot be challenged in cross-examination -- is simply a self-serving and risk-free way to try to influence public opinion.

On some basic points, however, Mr. Ajaj's account is supported by interviews with people in countries he traveled to before the bombing. In other instances, findings unearthed in the months since the end of the trial raise doubts about interpretations of the evidence presented by prosecutors.

2

ARTICLES REMAINING

SEE MY OPTIONS   Subscriber login

The most important example involves a notebook that the Government offered as proof that Mr. Ajaj studied explosives while abroad a number of months before the trade center explosion. Two independent handwriting analyses of the notebook commissioned by The New York Times indicate that, contrary to the Government's view, the notes were in all probability not written by Mr. Ajaj.

During the bombing trial, the Government convinced the jury that Mr. Ajaj was involved in the early stages of the bombing conspiracy. He had traveled from this country to Pakistan, where he got training in explosives, prosecutors said. He then returned to the United States with military manuals and notebooks in his suitcases, in the company of Ramzi Ahmed Yousef, who emerged in the trial as the mastermind of the bombing plot. Mr. Yousef fled the country the night of the bombing and has never been caught.

To convict Mr. Ajaj under the conspiracy statute, the prosecution had to prove beyond a reasonable doubt that Mr. Ajaj helped Mr. Yousef and also that he could foresee that Mr. Yousef intended to blow up buildings in the United States -- though not necessarily the World Trade Center.

Mr. Ajaj contends that he never knew what Mr. Yousef, whom he describes as a casual acquaintance, was planning to do in the United States, and that a web of coincidence put him in possession of materials that left him vulnerable to charges that he was a terrorist.

Mary Jo White, the United States Attorney in Manhattan, said she is confident that Mr. Ajaj's conviction will withstand any appeal.

"The differences in proof between the three other defendants and Ajaj, who was ably and vigorously represented at trial, were made clear to the jury," she said. "That there may have been more or different evidence as to other defendants does not make Ajaj any less guilty of the charges against him."

In a way, Mr. Ajaj's post-trial effort to exonerate himself pits one narrative of events against another. The Government, in what might be called the narrative of guilt, used the various pieces of circumstantial evidence that were introduced in the trial to prove that Mr. Ajaj played a role in the bombing conspiracy.

Mr. Ajaj, in what might be called the narrative of innocence, attempts to account for the most incriminating elements in the picture, especially his relationship with

2   Mr. Yousef and his possession of military manuals.
ARTICLES REMAINING                                                    SEE MY OPTIONS          Subscriber login

But the story goes back further than these pieces of evidence. Indeed, a re-examination of the case against him begins with Mr. Ajaj's life in the days before he first arrived on American soil. It indicates that, at that stage at least, the Ahmad Ajaj presented by the prosecution is different in important respects from the Ahmad Ajaj of reality. THE MOTIVE A Trip for Business Or for Terrorism?

The Government argued that Mr. Ajaj's motivation for participating in the bombing conspiracy was that he was a Palestinian militant with a fierce hatred of both Israel and the United States. Prosecutors cited the statement he made in his asylum application when he first came to the United States in 1992, in which Mr. Ajaj described relentless persecution of himself and his family by Israeli authorities. He recounts, for instance, imprisonment and torture like the burning of cigarette butts into his back.

Mr. Ajaj gave a long diatribe against Israel before he was sentenced at the trade center trial, and like many Palestinians he is likely anti-Israeli. Yet there is little evidence showing that the claims of persecution he made on his asylum application were more than what asylum claims often are: exaggerated accounts of abuse.

Interviews with Israeli security forces and with Palestinians in the Israeli-occupied territories turned up no evidence that Mr. Ajaj had any record in Israel of pro-Palestinian activity. He was arrested in Israel toward the end of 1987, but, according to court records in Jerusalem, his crime was an attempt to counterfeit $10,000 worth of $100 bills.

Members of B'Tselem, the main human rights group in Israel that has monitored treatment of Palestinians since the Intifada uprising began, said that it has no record of mistreatment of Mr. Ajaj. Further, the group says that Palestinians are sometimes beaten in prison by other Palestinians over internal quarrels and that victims of such beatings will often claim, out of either fear or loyalty, to have been beaten by the Israelis.

Mr. Ajaj's travels also figure into the question of motive. While Government prosecutors say that Mr. Ajaj traveled to Pakistan to acquire the expertise needed to participate in the bomb plot, Mr. Ajaj says the trip was the fulfillment of a long-term goal: to reinvigorate a student service business that he ran in Israel and that he wanted at that point to run from the United States.

There seems little doubt that Mr. Ajaj's occupation in Israel did involve running an office that helped Palestinians get accepted to universities in countries like

2

ARTICLES REMAINING    SEE MY OPTIONS    Subscriber login

Cyprus and Egypt. His Jordanian passport indicates his profession as "office owner." His family in East Jerusalem showed a visitor copies of the notices he placed in Arabic newspapers to advertise his service. The Israeli judge who sentenced Mr. Ajaj after his counterfeiting conviction told the court that 165 students were dependent on Mr. Ajaj's services.

Mr. Ajaj's occupation was one that would not have drawn favor with Palestinian nationalists, who wanted student-age young men to stay home and join the uprising. Further, some in Mr. Ajaj's neighborhood report that members of Hamas had warned Mr. Ajaj to stop his student service activities -- evidence that, contrary to the Government's portrayal of him, Mr. Ajaj may have been at odds with Palestinian militants. THE TRAVELS Flying to Pakistan Under False Name

The Government said that the secrecy and the haste of Mr. Ajaj's travel to Pakistan a year before the bombing indicate that he was already a member of the terror conspiracy. Mr. Ajaj, they say, traveled under a false name.

Further, he failed to get the permission -- called advance parole -- to assure that he would be allowed back into the United States upon his return, permission that, one prosecutor told the jury, could be obtained within a day.

Mr. Ajaj, by contrast, said that Pakistan was a promising place to expand his student service business. His partner in that business, Mohammed Abukedeir, who had also immigrated to Texas, said in an interview, and in a deposition taken for Mr. Ajaj's appeal, that Mr. Ajaj had often talked about going to Pakistan.

Mr. Ajaj acknowledges leaving Pakistan using the name Mohammed Abid. Mr. Abid was a Palestinian living in Houston who, at the local mosque, had offered to sell a cheap ticket to Pakistan that he had decided not to use himself.

Mr. Abid, reached by phone at his family's home in an Arab village near Haifa in Israel, confirmed that he sold his airline ticket to Mr. Ajaj and that he gave Mr. Ajaj a photocopy of the first two pages of his passport to show airline officials that the ticket had not been stolen. The photocopy was among Mr. Ajaj's things when he returned to the United States four months later.

Mr. Ajaj also said that he did not know he had to obtain papers to return to the United States. Moreover, in discussing the issue, the prosecutors failed to answer a key question: if Mr. Ajaj was a member of a conspiracy laying plans for an attack that required his return to this country, would he not have been sure to obtain advance

2

ARTICLES REMAINING                                   SEE MY OPTIONS        Subscriber login

Mr. Ajaj's handwriting, notes that he wrote in the margins of one of the trial documents.

One of the analyses was done by an Egyptian specialist in Arabic handwriting, Abdel Fattah Riad; the other was done by Charles Hamilton, a noted American handwriting expert who has frequently testified in criminal cases and who determined that the so-called Hitler Diaries were a hoax.

At the trial, neither side offered a handwriting analysis; the lead prosecutor, J. Gilmore Childers, said in court that no analyst was available.

Yet Mr. Ajaj did have military manuals with him, and both his and Mr. Yousef's fingerprints were on some of their pages. Even if he did not write the notebook, his fingerprints were on many pages.

Most important, the prosecution showed evidence that, when he arrived in the United States from Pakistan on the same plane as Mr. Yousef, he told an immigration agent he was traveling alone. He did that, the Government contended, to assure that Mr. Yousef would be able to slip into the country.

Mr. Ajaj said in an interview that the manuals were not his; they were among the many things he was carrying for others, including, for example, a large number of letters that, he says, he was carrying as favors to other Arabs he met in Pakistan.

He contends further that the books and manuals found in his possession also belonged to another person, whom he identifies as Yassin Bezaikah, a Jordanian who died in fighting near Kabul at the time Mr. Ajaj was in Pakistan.

Mr. Bezaikah did exist. An obituary of him in an Arabic magazine published in Peshawar in October 1992, several weeks after Mr. Ajaj returned to the United States, said that he came from the Jordanian desert town of Ma'am, that he received "every kind of military training" and that he died fighting in Afghanistan on Aug. 11, 1992.

Arabs interviewed in Peshawar confirmed that it was a common practice, when an Arab member of the mujahedeen died, for another Arab to be asked to carry his possessions out of Pakistan and mail them to the dead person's family, since mail service is so poor there.

They said that they remembered Mr. Bezaikah's suitcases being left in Peshawar at a place called the Abdullah Azam House, where mujahedeen often mingled with Arab students and others. Abu Bassam said that he remembered Mr. Ajaj staying at the Abdullah Azam House when he was in Peshawar.

2

ARTICLES REMAINING          SEE MY OPTIONS          Subscriber login

business class full, they bought first-class tickets, but at a reduced price. This would explain, Mr. Ajaj said, how the two had sequentially numbered tickets.

Since Mr. Ajaj had a passport with a Pakistani name, Kurram Khan, he did not want to call attention to himself at places like airport check-in counters, so he allowed Rashed to take care of obtaining boarding passes.

"Rashed just gave me my boarding passes," he said. "That's all."

The second most incriminating piece of evidence presented against Mr. Ajaj involved the presence of his fingerprints on numerous pages of the military manuals -- including on the very pages that contained bomb-making formulas --and on the notebooks.

Explaining this, Mr. Ajaj said that just before leaving Pakistan with Mr. Yousef, he picked up Mr. Bezaikah's suitcases at the Abdullah Azam House. Travelers from Peshawar to New York have to lay over in Karachi for the night, and Mr. Ajaj said that he shared a room at the Midway Hotel near the airport.

"I looked in the suitcases and I saw the books," Mr. Ajaj said. "I wanted to see if there were any things that were against the United States," he continued, giving his explanation for the presence of his fingerprints on the military manuals and notebooks. He said that he flipped through the pages and read passages here and there.

Given that Mr. Bezaikah was a fighter in Afghanistan, Mr. Ajaj found it unsurprising and also innocuous that he had a set of military manuals.

Moreover, since the manuals were in the Government's possession during the entire planning of the trade center bombing, they could not have been used in the trade center attack. Only one volume of the manuals involved explosives: formulas only for small pipe-bombs of the sort that would be used in guerrilla warfare. There were no instructions on the manufacture of large bombs of the sort that were used in the trade center explosion.

Mr. Ajaj is now working on his appeal with a court-appointed lawyer, Miranda Fritz. Ms. Fritz has said that she will ask for a reversal of Mr. Ajaj's conviction and a new trial, citing new evidence in the case and claiming that Mr. Ajaj did not get effective assistance from his trial lawyer, Austin V. Campriello. Mr. Campriello, citing attorney-client confidentiality rules, refused to discuss his handling of the case.

2

ARTICLES REMAINING

SEE MY OPTIONS        Subscriber login

Mr. Ajaj offers no proof that the military manuals and notebooks found on him were actually among Mr. Bezaikah's possessions, but there were other things in his luggage that bore Mr. Bezaikah's name. THE CONTACTS An Acquaintance Or an Accomplice?

The single most incriminating piece of evidence presented against Mr. Ajaj involved the fact that he was on the same plane as the man accused of being the mastermind of the bombing, Mr. Yousef. The two men had sequentially numbered first-class tickets on Pakistan International Airlines, and they sat together on the first leg of their journey to New York, from Peshawar to Karachi.

But they sat apart from Karachi to New York, a fact that, the Government said, showed their eagerness not to appear to be traveling together.

Mr. Ajaj depicts Mr. Yousef as a chance acquaintance who seemed willing and able to help him when he was desperately seeking to get back to the United States. His residency permit in Pakistan was about to expire, he said, and he risked imprisonment if he stayed longer.

In the trial, the prosecution described how Mr. Ajaj went to the American Embassy in Islamabad to ask for a visa, but, having failed to obtain advance parole, was turned down.

Mr. Ajaj then went to the bustling market in falsified passports in Pakistan, and he bought a Swedish passport in the name Kurram Khan. The original photograph was replaced by a picture of Mr. Ajaj.

Shortly before that, Mr. Ajaj said, he met the man he knew as Rashed.

"The day I was refused at the United States Embassy, I went to the Arabic Center in Islamabad looking for a place to stay. I met Ramzi Yousef there. I knew him as Rashed. I told my story to people there and Rashed said that he wanted to go to the U.S., too. He said that he had fought the Communists in Afghanistan but now he wanted to go someplace else."

Mr. Ajaj said that Rashed spoke Urdu and English well, so he came to rely on him for help. Mr. Ajaj, who says he had received a check to cover the cost of his return ticket from his friend, Mr. Abukedeir in Houston, gave money to Rashed to buy his ticket for him.

Mr. Ajaj said that students had told him that people who travel on business class

2

ARTICLES REMAINING

or first-class tickets are treated better once they arrive in the United States. With

SEE MY OPTIONS          Subscriber login

Ms. Fritz says she believes that the evidence exists to undermine the prosecution's case, but that it has never been presented to a jury. Whether she is correct will be known only if Mr. Ajaj wins his appeal and is able to tell his side of the story before a jury in a second trial.

The TimesMachine archive viewer is a subscriber-only feature.

We are continually improving the quality of our text archives. Please send feedback, error reports, and suggestions to archive_feedback@nytimes.com.

A version of this biography; special report appears in print on October 17, 1994, on Page B00001 of the National edition with the headline: Evidence Re-examined: A special report; Questions Raised In One Conviction In Blast at Towers.

---

© 2018 The New York Times Company

MYLROIE

# The First World Trade Center Attack
and
# Saddam Hussein's War against America

## LAURIE MYLROIE

Coauthor of the *New York Times* #1 Bestseller
*Saddam Hussein and the Crisis in the Gulf*

Foreword by Former

**Those Who Did Not Flee.** The flight, or nonflight, of the various World Trade Center suspects also suggests that the New York extremists were meant to be caught. Two suspects did not even try to flee, four fled, and one tried but failed.

Nidal Ayyad and Ahmad Ajaj remained behind. Both men, for very different reasons, thought they had nothing to fear. Ayyad was brazen. He was not involved directly in the actual construction of the bomb at Pamrapo Avenue, and evidently he thought he could not be held criminally responsible, although he had participated in other aspects of the bombing.

In the days following the bombing, Ayyad telephoned three New York newspapers and sent them letters claiming credit for the bombing in the name of the "Liberation Army, Fifth Battalion," with "Staff Lieutenant General [*al-Fareek al-Rokn*] Abu Bakr al-Makee" typed below. Ayyad's voice was subsequently identified on a recording left by an anonymous caller on the "News Tips" line of one newspaper. DNA testing of the saliva on an envelope containing one of the letters claiming responsibility for the blast revealed that the saliva matched his own.

Ayyad borrowed a radio from a colleague at work the day of the bombing, and then listened to an all-news station. The next day, Ayyad explained to the same colleague how a nitrate bomb could be made. Both actions were later cited as evidence against Ayyad during the trial. That behavior in the days after the bombing highlights the naïveté of the Palestinians involved. Ayyad was arrested on March 10.

### Ahmad Ajaj—Wrongfully Convicted?

Ahmad Ajaj acted with a similar sang-froid. But it seems that he did so because in fact he had nothing to do with the bombing.[8] In jail at the time of the bombing, Ajaj was released on March 1, after having served six months for illegal entry.

His release, however, was a mistake. Ajaj was still supposed to be held, subject to a pending immigration deportation order. Unaware that any error had been made, Ajaj tried to find a permanent place to stay, as his uncle in Houston would not take him back. He asked for help from his designated parole officer, George Gonzalez, who tried to arrange temporary shelter for him

in a Brooklyn mosque. The mosque, however, was reluctant. It put Ajaj up for one night, after which he slept in the subways.

Five days later, Gonzalez located a distant relative of Ajaj's in Dallas who agreed to take Ajaj in. As Gonzalez later explained, "I was curious why INS released him, so I called INS and was told he was released by mistake."[9] Ajaj was rearrested on March 9 in Gonzalez's office, to be held for possible deportation.

Investigators did not begin to link him with the World Trade Center bombing until April. He was charged with involvement in the bombing in mid-May, after authorities learned that he had entered the United States with Ramzi Yousef on a false passport.

Like the other defendants, Ajaj was convicted and sentenced to 240 years in prison. But it is not clear that Ajaj was even aware of the bombing plot, or that he understood that his traveling companion from Pakistan to New York, Ramzi Yousef, had masterminded the bombing. After all, Ajaj's role presumably was to create a diversion to facilitate Yousef's entry into America. Particularly as they had only known each other for a brief period, Yousef would have remained silent about his plans for the bombing, at least until they had both passed through immigration at JFK Airport. Until they had done so, Yousef would have had to assume that Ajaj might well face a prolonged engagement with U.S. law enforcement officials, as in fact he did, and that if he knew anything, he might talk.

Nor does it appear that Yousef could have revealed his plans subsequently. Yousef did not tell Ajaj about them over the telephone, as all Ajaj's phone conversations were taped and they contained no references to making bombs or to the World Trade Center.[10] Ajaj received no visitors and no mail while he was in prison. How could Ajaj have learned that Yousef was building a bomb in Jersey City? And even after the World Trade Center bombing, would Ajaj have known that Yousef had been responsible for it?

At the sentencing, Ajaj was the only defendant to assert his innocence, claiming, "Up to this very moment I do not know where the World Trade Center is. . . . I did not know anything of the bomb." Ajaj condemned the bombing as a "horrible crime," even as he harangued the courtroom with a long diatribe about Palestinian suffering at the hands of "fascist Zionist gangs"

backed by the United States.[11] After two-and-a-half hours, Judge Duffy finally cut him off.

Israeli and Jordanian authorities have identified Ajaj as a petty counterfeiter. But the prosecution presented no real evidence during the trial to show that Ajaj was aware that a bomb was being built in Jersey City while he served out his prison term.

**The Evidence.** A focus of the government's charges against Ajaj is a December 29, 1992, telephone conversation between Yousef and Ajaj. The government claimed that Ajaj tried to arrange to send Yousef the materials—including the bombmaking manuals—he had carried into the United States, which had been seized by immigration authorities at the time of his arrest.

But there is little evidence for that. Ajaj wanted to ensure the safety of his belongings, but he did not want to send them to Yousef. Shortly before, at his December 22 sentencing hearing, the judge had ordered that Ajaj's personal effects be returned to him. Ajaj was concerned that they might be sent to a Texas address to which he did not want them to go. In their December 29 conversation, Ajaj suggested to Yousef that he would ask his attorney to have them sent to a different address. Yousef proposed, "Is it possible that I receive them?" an idea he pressed repeatedly.

Ajaj was reluctant. He first suggested that it would be better for Yousef to send someone else to pick them up. Later in the conversation, when Yousef proposed precisely that, Ajaj replied, "We'll see." Yousef raised the subject a third and last time, saying, "I will call your friend [the lawyer], so that I leave him an address. The address of someone who would come and pick up your belongings." Ajaj responded, "God willing"—that is, *Insha' Allah*.[12]

As used by Arabic speakers, that phrase can mean many things—fervent assent, indifference, or polite disagreement. Anyone dealing with an Arab bureaucrat who is told *Insha' Allah* is not pleased. By "God willing," the speaker means that the matter is not in his hands, so please do not expect an answer from him, at least not any time soon.

In fact, Ajaj did not even try to send his belongings to Yousef. A week later, on January 4, 1993, Ajaj's lawyer wrote to the court that his client requested that his property be sent to the address of Imran Mirza, Ajaj's immigration lawyer during his 1991–1992 asylum appeal. (See illustration 8–1; the letter reading "January 4, 1992," should read "January 4, 1993"; it reflects a New Year's clerical error.) However, that was not done. The material, for some reason, was held for "safekeeping," and it remained with the government.

It is clear that Ajaj did not want to send his belongings to Yousef. The bombmaking manuals never reached Yousef, and they were thus irrelevant to the bombing.

Ajaj himself did not seem to have been particularly interested in the bombing manuals. They were nothing special. The information they contained was legally and readily available in the United States. During the World Trade Center trial, a private investigator hired by the defense explained that he had readily checked out *The Anarchist Cookbook*, replete with bomb recipes, from the Mount Vernon Public Library, and that he had just as easily ordered two videotapes, "Homemade C4: A Closer Look" and "Deadly Explosives: How and Why They Work," from advertisements in a *Soldier of Fortune* magazine.

Ajaj knew all that, generally. Shortly after his September 1, 1992, arrest, Ajaj told friends that he did not expect a long sentence, despite the discovery of bombmaking manuals in his possession, because "similar ones are available in America."[13] Besides, Ajaj's manuals were about operations much simpler than the World Trade Center bombing. None of the bomb formulas in Ajaj's manuals quite matched that for the World Trade Center bomb, which was very rare. According to the government, urea nitrate had never been used as an explosive in a bomb abroad, and it had only been used once before in the United States, in a pipe bomb some five years previously.[14]

There were other items among Ajaj's belongings of much greater value than the bombmaking manuals. Ajaj's telephone conversations suggest that he was worried about two things. One was an airline ticket; and the other, his principal concern, was purloined identity documents. Ajaj brought into the United States twenty-two documents in the names of ten other people.

## ILLUSTRATION 8–1
### LETTER FROM AHMAD AJAJ'S LAWYER



# THE LEGAL AID SOCIETY
CRIMINAL DEFENSE DIVISION • FEDERAL DEFENDER SERVICES UNIT
EASTERN DISTRICT OF NEW YORK
225 Cadman Plaza East, Brooklyn, New York 11201
Tel.: (718) 330-1200   Fax: (718) 855-0760

*Executive Director and*
*Attorney-in-Chief*
*Archibald R. Murray*

*Chief of Operations*
*Leonard F. Joy*

*Attorney-in-Charge*
*Thomas J. Concannon*

January 4, 1992

Mr. Eric Bernstein, Esq.
Assistant United States Attorney
United States Attorney's Office
Eastern District of New York
225 Cadman Plaza East
Brooklyn, N.Y. 11201

<u>U.S.A. v. Ahmad Ajaj aka Khurram Khan, 92 CR 993 (RR)</u>

Dear Mr. Bernstein:

This letter confirms that my client Mr. Ahmad Ajaj has asked me to ask the government to send his property to Mr. Imran Mirza, Esq., 190 West Loop South, Suite 950, Houston, Texas 77027.

Please send me a confirmatory letter as soon as his property has been sent.

Thank you for your attention to this matter.

Sincerely,

Douglas G. Morris

Associate Attorney
(718) 330-1209

cc: The Honorable Reena Raggi
    U.S. District Judge

    Mr. Robert Heinemann, Esq.
    Clerk of the Court

    Defendant

SOURCE: Court files.

The jewels among them were three passports, all apparently stolen in Pakistan.

ABC News located the owner of one of those passports, Azan Muhammad, a young Pakistani with British citizenship, living in England. Azan Muhammad explained that his passport had been lost during a 1991 trip to Pakistan. Immigration stamps on the other two passports—one Saudi and the other Swedish, belonging to Khurram Khan (the passport that Ajaj had used to enter the United States)—suggest that they, too, were lost in Pakistan, around the same time.

Ajaj also had a U.K. driver's license belonging to Azan Muhammad; an international certificate of vaccination in the name of Khurram Khan; a Moroccan secondary education certificate belonging to yet another person; a copy of a blank Iraqi passport; and still more documents in other names. Ajaj was a counterfeiter. By altering details on the documents, perhaps with a Xerox machine, Ajaj produced false papers to corroborate the stolen passports and to create fictitious identities.

A document found in Ajaj's possession illustrates the technique. Illustration 8–2 reproduces a medical report from a Kuwaiti hospital, dated April 28, 1990, describing the recovery of Azan Muhammad from an automobile accident in which he had broken his nose. Ajaj's picture is on the medical report, and it has been assumed that Ajaj was the person who had the accident in Kuwait.

Azan Muhammad's passport, as found in Ajaj's possession, had an April 9, 1990, entry stamp into Kuwait, numbered "124." But Muhammad said that he had never been to Kuwait before he lost his passport in 1991. The Kuwaiti stamp in Muhammad's passport is a forgery, intended to make the Muhammad passport corroborate the Kuwaiti medical report. There is no Kuwaiti visa or exit stamp to accompany the entry stamp, as there should be. Indeed, the same entry stamp, number 124, dated April 9, with the year obscured, appears on Ajaj's Jordanian passport.

Moreover, if the Kuwaiti medical report did not belong to Azan Muhammad, neither did it belong to Ajaj. In April 1990, Ajaj was under the supervision of Israeli police. He was required to report twice daily to them. His picture had been added to the original report about an unknown third person.

ILLUSTRATION 8–2
MEDICAL REPORT FOR "AZAN MOHAMMAD"



| MINISTRY OF PUBLIC HEALTH | وزارة الصحة العامة |
| KUWAIT -- ARABIAN GULF | الكويت ـ الخليج العربي |



Reference ............................
Date ....28/4/1990

MEDICAL REPORT

Numsi, Azan Muhammad
Age: 20 years.
File No: 38802

Azan 20 yrs male was admitted in Adan Hospital on 17/4/1990 with the complains of bleeding face & broken nose resulted from a car accident.
On examination he had marked DNS to left side almost touching to lat.wal of nose. Union between bony and cartilagenous septum and a part of perpendicular plate of ethmoid & vomer were broken. Ears & throat examination did not revel any abnormality. Sinuses were unclear and full of blood.

Pt. underwent operation, bleeding points were cathotrised & stopped, broken parts of the nose were custied. Sinuses were cleared and small broken strip of cartilage was removed from floor.
Sillastic-sheet was put on left side for 10 days.
He made uneventful recovery postoperatively and was discharged on 26/4/1990.



Dr. S. Chauhan
E.N.T. DEPT.
AL-ADAN HOSPITAL

GOVERNMENT
EXHIBIT
2799
SS-93 Cr 180

| CABLES : HEALTH KUWAIT | برقيا : صحة الكويت |
| | الوزارة الثانية المترومات |
| Admin. Affairs | Financial Affairs | Medical Stores | |
| P. O. Box No. | 5 | 1510 | 23578 | ٢٣٥٧٨ | ١٥١٠ | ٥ | ص.ب. |
| TELEX No. | 22729 | 22191 | 23743 | ٢٣٧٤٣ | ٢٢١٩١ | ٢٢٧٢٩ | تلكس |
| ٢٠٠ - ٢٧ - ٩ | | | | | | |

SOURCE: Government Exhibit 2799, *United States v. Muhammad Salameh et al.*

The trove of documents that U.S. authorities had seized from Ajaj upon his immigration inspection would not be easy to replace. Those documents, not the bombmaking manuals, seem to have been Ajaj's main concern. That appears from Ajaj's telephone conversations. Ajaj was close to another Palestinian, Muhammad Abu Khdeir, proprietor of a Dallas hamburger shop. Abu Khdeir was also involved in Islamic activities, and Ajaj had known him from his earlier stay in Texas. Ajaj called him frequently from prison. Ajaj's telephone conversations were monitored, and Ajaj spoke to Abu Khdeir elliptically. He referred to his jihad activities as "studying" and to Pakistan as "the university."

In his first call to Abu Khdeir, on September 12, 1992, Ajaj expressed his concern about losing the materials that he had carried into the United States: "They've taken all my papers . . . all my telephone numbers . . . all the cards. . . . Everything!"[15]

Subsequently, Abu Khdeir tried to get that material from prison authorities for Ajaj. "Did you ask about the papers?" Ajaj asked Abu Khdeir on October 7. "I called three to four times, but nothing was there," Abu Khdeir replied. "I think they got stolen," Ajaj concluded. Ajaj also thought of an airplane ticket among his belongings. "Well, the ticket is lost now. May the Lord's vengeance be upon all nonbelievers."[16]

Similarly, in his December 29 discussion with Yousef, Ajaj was concerned, above all, with the passports and identity papers. "I don't want my passport to get lost . . . and the original university diplomas and things. You know the university diplomas."[17] Of course, there were no university diplomas among Ajaj's possessions. He was referring to the identity documents.

Nor is it likely that Yousef himself was particularly interested in the bombmaking manuals, either, as he could easily obtain the same information elsewhere. Yousef, too, seems to have been most interested in the treasure trove of identity papers. Indeed, the irrelevance of those "bombmaking manuals" became clear, following Yousef's aborted plot to bomb twelve U.S. airplanes. The books and handwritten instructions he used were far more sophisticated than anything Ajaj ever had in his possession.

The transcripts of Ajaj's prison conversations—from September 12, 1992, the first presented into evidence, until April 12,



1993, the last—provide a consistent, coherent picture. Ajaj was strongly, even fanatically, committed to the Palestinian and Islamic cause. His role was to forge identity documents for his compatriots, and he looked forward to getting out of prison and resuming that activity. Although there is no reason to question the other verdicts, Ajaj seems to have been the victim of prosecutorial excess.

### Those Who Fled or Tried to Flee

After the bombing, four people fled: the mystery man, about whom practically nothing was known; Ramzi Yousef; Mahmud Abu Halima; and Abdul Rahman Yasin. Also, Muhammad Salameh tried to flee.

Regarding the mystery man, investigators did not know either his nationality or the name under which he had entered or left the United States. "Rashid" was the name that Yousef used in New York, and the mystery man was known to the others only as "Rashid's friend." As Ayyad later explained to authorities, Salameh told him before the bombing,

> Rashid's friend is coming to help us. He arrived one week prior to the bombing.... The night of the bombing, Salameh took Rashid and his friend to John F. Kennedy International Airport for flights out of the country.[18]

As we have seen, Yousef's very elaborate preparations for escape had already begun in December, with his phone calls to Baluchistan and his application for a new passport in the name of Abdul Basit Mahmood Abdul Karim. On February 23, three days before the bombing, he purchased a ticket for Pakistan—the only known conspirator (along with his "friend") to buy his ticket before the bombing.

The evening of the blast, Abu Halima appeared at a car service company where he occasionally worked. As the proprietor testified, Abu Halima "looked very scared, very nervous." Abu Halima told him that there had been an "accident" and he began to pray in the office, something he had never done before. The next day Abu Halima purchased a ticket for a March 1 flight to Saudi Arabia, from where he went on to Egypt. He also bought

tickets to Cairo, for his wife and four children to follow him. Abu Halima paid cash for the lot, later telling fellow inmate Theodore Williams that the money for the tickets had come from abroad.

But despite the money he had, Abu Halima's flight was not well considered. He had no secure place to go. He went to his family home in Egypt and remained there, despite the arrests of Salameh and Ayyad. Egyptian authorities arrested Abu Halima on March 16.

Abdul Rahman Yasin bought a ticket to Jordan on March 1 for a flight departing March 5—Royal Jordanian Flight 262. He took that plane the day after he was picked up, questioned, and released by New Jersey FBI. From Jordan, Yasin went on to Baghdad.

Flight 262 stops in Amsterdam. Muhammad Salameh also bought a ticket on March 1 for Flight 262, departing March 5. But Salameh was short of money. He did not have enough for an adult ticket to Jordan, let alone Europe. He bought an infant ticket only as far as Amsterdam for $65.45, which he used to get a visa from the Dutch consulate.

Salameh was arrested on March 4 as he returned for the fourth time to the rental agency in an effort to recover his $400 deposit on the van. Salameh has been ridiculed for that, and 97 percent of Americans say they would not have done as he did.[19] But Salameh undoubtedly needed the money to buy an adult ticket, so he could actually get on the plane. If those most responsible for the bombing had wanted to ensure that Salameh did not get caught, they surely could have provided him the few hundred dollars he needed. More likely, those most responsible for the bombing directed the doltish Salameh back to the rental agency specifically to facilitate his arrest.

### The Conceptualization of the World Trade Center Bombing

If the conspirators had indeed succeeded in causing the death and destruction they planned, the bombing would have been a historically traumatic event on the scale of Pearl Harbor or the sinking of the *Maine*, both of which sent America to war. On such dramatic occasions people want immediate answers. There

# Bureau of Prisons
## Health Services
## Inmate Intra-Complex Transfer

| | |
|---|---|
| **Reg #:** 40637-053 | **Inmate Name:** AJAJ, AHMAD MOHAMMAD |

SENSITIVE BUT UNCLASSIFIED – This information is confidential and must be appropriately safeguarded.

Transfer To: B/B Unit, USP Florence, CO          Transfer Date: 08/17/2017

**Health Problems**

| Health Problem | Status |
|---|---|
| Varicella (Chicken Pox)w/o mention of complication | Current |
|    Probable Varicella zorster infection | |
| Unspecified vitamin D deficiency | Current |
| Unspecified vitamin D deficiency | Current |
|    poor po intake of Vit D sourses (dairy products) | |
| Myopia | Current |
| Myopia | Current |
| Regular astigmatism | Current |
|    OS only | |
| Presbyopia | Current |
| Hypertension, Benign Essential | Current |
| Asthma, unspecified | Current |
|    s/p pulmonology consult; but dx never added to chart. | |
| Cracked tooth - nontraumatic | Current |
|    Unable to locate source of discomfort, symptoms coincide with cracked tooth syndrome. | |
| Gastritis | Current |
|    seen on EGD | |
| Dyspepsia and other spec disorders (Stomach Pain) | Current |
| Diverticulosis of colon w/o mention of hemorrhage | Current |
|    seen on colonoscopy | |
| Irritable bowel syndrome | Current |
| Dermatitis due to other specified cause | Current |
| Osteoarthrosis, unspec, site unspecified | Current |
| Spinal stenosis, lumbar w neurogenic claudication | Current |
| Low back pain, lumbago | Current |
| Chronic fatigue syndrome | Current |
| Other malaise and fatigue | Current |
| Insect bite, nonvenom, of hip and leg w/o infect | Current |
|    Right buttock and knee | |
| Allergy, unspecified | Current |
| Unspecified Sleep-Wake Disorder | Current |
| Carpal tunnel syndrome | Current |
| Polyneuropathy, unspecified | Current |
| Acute gingivitis, plaque induced | Current |
| Partial loss of teeth | Current |
| Disorder of teeth and supporting structures, unspecified | Current |
| Cervicalgia | Current |
| Other muscle spasm | Current |
| Pain, unspecified | Current |
| Allergy to other foods | Current |
|    Reports allergies to Peas, Beans, Peanut Butter, and Milk. | |
| Other history presenting hazard to health | Current |
|    Respiratory tract condition as a result of secondary exposure to OC pepper gas. | |
| Acquired absence of lung | Current |
|    S/P left pneumonectomy for bronchial carcinoid 1997. | |
| Tricuspid valve disorders, spec as nonrheumatic | Remission |
| Esophageal reflux | Remission |
|    with OTC ranitidine | |
| Unspecified Depressive Disorder | Remission |

4733

# CERTIFICATE OF COMPLETION

## Ahmad Ajaj

## 500 Hours of Community Service

Chaplain J. Sutter

Life Connections Chaplain

6



**Individualized Reentry Plan - Program Review  (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: AJAJ, AHMAD MOHAMMAD  40637-053

SEQUENCE: 00498402
Team Date: 01-29-2020

| | | | | |
|---|---|---|---|---|
| Facility: | ALP  ALLENWOOD USP | | Proj. Rel. Date: | 06-25-2093 |
| Name: | AJAJ, AHMAD MOHAMMAD | | Proj. Rel. Mthd: | GCT REL |
| Register No.: | 40637-053 | | DNA Status: | FLM01238 / 07-29-2009 |
| Age: | 54 | | | |
| Date of Birth: | 12-12-1965 | | | |

**Detainers**

| Detaining Agency | | Remarks | |
|---|---|---|---|
| DEPORTATION | | null | |

**Current Work Assignments**

| Facl | Assignment | Description | Start |
|---|---|---|---|
| ALP | C SAN 2 PM | CORRIDOR SANATATION 2 PM | 12-16-2019 |

**Current Education Information**

| Faci | Assignment | Description | Start |
|---|---|---|---|
| ALP | ESL HAS | ENGLISH PROFICIENT | 02-19-1993 |
| ALP | GED HAS | COMPLETED GED OR HS DIPLOMA | 11-30-1994 |

**Education Courses**

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| THP LCP | C | NUTRITION SCIENCE & RESEARCH | 03-16-2018 | 06-08-2018 |
| THP LCP | C | ACE HOSPITALITY MANAGEMENT | 05-08-2018 | 05-22-2018 |
| THP LCP | C | INTRODUCTION TO JOURNALISM | 05-08-2018 | 05-22-2018 |
| THP LCP | C | ACE FOOD SAFETY | 05-08-2018 | 05-22-2018 |
| THP LCP | C | ACE PREPARING A RESUME | 05-08-2018 | 05-22-2018 |
| THP LCP | C | ACE MONEY SMART | 05-08-2018 | 05-22-2018 |
| THP LCP | C | ACE ELECTRICAL TRADE | 05-08-2018 | 05-22-2018 |
| THP LCP | C | ACE TIME MANAGEMENT | 05-08-2018 | 05-22-2018 |
| MAR CMU | C | ORTHOGRAPHY | 09-20-2010 | 12-06-2010 |
| MAR CMU | C | CMU COSMIC ODYSSEY | 09-20-2010 | 12-06-2010 |
| FLM | C | HISTORY OF SCIENCE - PART 1 | 08-27-2009 | 10-28-2009 |
| FLM | C | HISTORY OF WORLD WAR II | 02-18-2009 | 04-28-2009 |
| FLM | C | HISTORY OF EUROPEAN ART PART 1 | 09-25-2008 | 12-17-2008 |
| FLM | C | AMERICAN EXPERIENCE PART 4 | 10-01-2008 | 12-23-2008 |
| FLP | C | FILM IMPACT D/B | 03-13-2008 | 05-05-2008 |
| FLM | C | FAMOUS ROMANS | 12-06-2007 | 02-27-2008 |
| FLM | C | FAMOUS GREEKS | 09-13-2007 | 12-05-2007 |
| FLM | C | JAZZ - PART 2 | 09-05-2007 | 11-13-2007 |
| FLM | C | PHYSICS IN YOUR LIFE - PART 2 | 04-19-2007 | 06-20-2007 |
| FLM | C | THE AMERICAN EXPERIENCE-PART 2 | 04-04-2007 | 06-26-2007 |
| FLM | C | PHYSICS IN YOUR LIFE - PART 1 | 02-15-2007 | 04-18-2007 |
| FLM | C | AMER. REVL. + US MEXICAN WAR | 01-24-2007 | 04-03-2007 |
| FLM | C | NATURAL LAW & HUMAN NATURE | 11-23-2006 | 02-14-2007 |
| FLM | C | ANIMALS OF THE WORLD | 11-01-2006 | 01-23-2007 |
| FLM | C | THE WORLD OF BYZANTIUM | 08-31-2006 | 11-22-2006 |
| FLM | C | THE AMERICAN EXPERIENCE PART 1 | 08-09-2006 | 10-31-2006 |
| FLM | C | R. E. LEE AND HIS HIGH COMMAND | 06-08-2006 | 08-30-2006 |
| FLM | C | COSMOS | 05-17-2006 | 08-08-2006 |
| FLM | C | JOY OF THINKING: MATH IDEAS | 06-23-2005 | 09-14-2005 |
| FLM | W | TRANSPORTATION | 09-15-2005 | 09-29-2005 |
| FLM | W | CIVIL WAR (KEN BURNS) | 09-21-2005 | 09-29-2005 |
| FLM | C | FAMOUS AUTHORS | 06-29-2005 | 09-20-2005 |
| FLM | C | BIRTH OF THE MODERN MIND | 04-06-2005 | 06-28-2005 |
| FLM | C | CONQUEST OF THE AMERICAS | 03-31-2005 | 06-22-2005 |
| FLM | C | HEALTH EDUCATION CLASS | 03-14-2005 | 05-20-2005 |
| FLM | C | HISTORY OF ANCIENT EGYPT -2 | 01-12-2005 | 04-05-2005 |
| FLM | C | ASTRONOMY-INTRO TO UNIVERSE 2 | 01-20-2005 | 03-30-2005 |



**Individualized Reentry Plan - Program Review  (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: AJAJ, AHMAD MOHAMMAD   40637-053

SEQUENCE: 00498402
Team Date: 01-29-2020

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| FLM | C | ASTRONOMY-INTRO TO UNIVERSE 1 | 11-11-2004 | 01-19-2005 |
| FLM | C | HISTORY OF ANCIENT EGYPT -1 | 09-29-2004 | 12-21-2004 |
| FLM | C | ARGUMENTATION·EFFEC. | 08-19-2004 | 11-10-2004 |
| FLM | C | BLACK AMERICANS | 06-10-2004 | 08-18-2004 |
| FLM | C | DISC OF ANCIENT CIVILIZATIONS | 03-18-2004 | 06-09-2004 |
| FLM | C | WORLD RELIG-ISLAM/CHRISTIANITY | 04-07-2004 | 06-29-2004 |
| FLM | C | THE JOY OF SCIENCE - PART 3 | 01-08-2004 | 03-17-2004 |
| FLM | C | HISTORY OF ANCIENT ROME-PART 2 | 01-14-2004 | 04-06-2004 |
| FLM | C | INSIDE THE GLOBAL ECONOMY | 10-09-2003 | 01-07-2004 |
| FLM | C | HISTORY OF ANCIENT ROME-PART 1 | 10-22-2003 | 01-13-2004 |
| FLP | C | LEGAL WORKSHOP | 03-02-1995 | 05-01-1995 |

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|--------------|-----------------|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

### Current Care Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1-MH | CARE1-MENTAL HEALTH | 06-08-2010 |
| CARE2 | STABLE, CHRONIC CARE | 05-25-2012 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| LOWER BUNK | LOWER BUNK REQUIRED | 03-27-2018 |
| NO DUTY | NO DUTY DUE TO MEDICAL COND | 05-02-2018 |
| NO F/S | NO FOOD SERVICE WORK | 05-25-2012 |
| NO POLLUT | ASSIGN TO POLLUTION FREE AREA | 05-25-2012 |
| PAPER | LEGACY PAPER MEDICAL RECORD | 02-27-2019 |
| WGT 20 LB | WEIGHT-NO LIFTING OVER 20 LBS | 04-03-2019 |

### Current Drug Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| DAP NO INT | DRUG ABUSE PROGRAM NO INTEREST | 02-07-2018 |
| DRG E COMP | DRUG EDUCATION COMPLETED | 03-20-2004 |
| DRG I NONE | NO DRUG INTERVIEW REQUIRED | 06-19-1994 |

### FRP Details

| Most Recent Payment Plan |
|--------------------------|

| FRP Assignment: | **NO OBLG** | **FINANC RESP-NO** | | **Start: 02-04-2015** |
|-----------------|-------------|--------------------|--|----------------------|
| Inmate Decision: | **AGREED** | **$25.00** | | Frequency: **QUARTERLY** |
| Payments past 6 months: | **$0.00** | | Obligation Balance: **$250,000,000.0** |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|-----|------|--------|---------|---------|--------|
| 1 | ASSMT | $500.00 | $450.00 | IMMEDIATE | EXPIRED |
| | | *** NO ADJUSTMENTS MADE IN LAST 6 MONTHS *** | | | |
| 3 | FINE | $250,000.00 | $250,000.00 | IMMEDIATE | EXPIRED |
| | | *** NO ADJUSTMENTS MADE IN LAST 6 MONTHS *** | | | |
| 2 | REST NV | $250,000,000.00 | $250,000,000.00 | DEFERRED | WAIT PLAN |
| | | *** NO ADJUSTMENTS MADE IN LAST 6 MONTHS *** | | | |

**Payment Details**

| Trust Fund Deposits - Past 6 months:  $2,100.00 | Payments commensurate ?   N |
|-------------------------------------------------|------------------------------|
| New Payment Plan: | ** No data ** |

### Progress since last review

| Incident report free since 2012. |
|----------------------------------|

### Next Program Review Goals

# Bureau of Prisons
## Health Services
## Health Problems

Reg #: 40637-053                    Inmate Name: AJAJ, AHMAD MOHAMMAD

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|

## Current

**Unspecified vitamin D deficiency**
11/26/2012 10:03 EST  Wilson, CA DO

| | III | ICD-9 | 268.9 | 11/26/2012 | Current | 11/26/2012 |
|---|---|---|---|---|---|---|

**Myopia**
06/13/2011 15:03 EST  Alberts, Megan O.D.

| | III | ICD-9 | 367.1 | 06/13/2011 | Current | 06/13/2011 |
|---|---|---|---|---|---|---|

**Regular astigmatism**
10/09/2015 14:44 EST  Clough, S. OD
   OS only

| | III | ICD-9 | 367.21 | 10/09/2015 | Current | 10/09/2015 |
|---|---|---|---|---|---|---|

**Presbyopia**
03/15/2013 13:05 EST  Clough, S. OD

| | III | ICD-9 | 367.4 | 03/15/2013 | Current | 03/15/2013 |
|---|---|---|---|---|---|---|

**Hypertension, Benign Essential**
02/18/2015 11:41 EST  Santini, G. MD

| | III | ICD-9 | 401.1 | 02/18/2015 | Current | 02/18/2015 |
|---|---|---|---|---|---|---|

**Asthma, unspecified**
12/23/2013 11:30 EST  Allred, D. DO
   s/p pulmonology consult; but dx never added to chart.

| | III | ICD-9 | 493.90 | 12/23/2013 | Current | 12/23/2013 |
|---|---|---|---|---|---|---|

**Dyspepsia and other spec disorders (Stomach Pain)**
10/20/2011 13:20 EST  Szoke, David MD, CD

| | III | ICD-9 | 536.8 | 10/20/2011 | Current | 10/20/2011 |
|---|---|---|---|---|---|---|

**Diverticulosis of colon w/o mention of hemorrhage**
02/05/2018 16:53 EST  Lukens, David MD
   seen on colonoscopy--EXAM refusal 2017 OCT.

| | III | ICD-9 | 562.10 | 05/29/2012 | Current | 05/29/2012 |
|---|---|---|---|---|---|---|

05/29/2012 15:30 EST  Wilson, CA DO
   seen on colonoscopy

| | III | ICD-9 | 562.10 | 05/29/2012 | Current | 05/29/2012 |
|---|---|---|---|---|---|---|

**Irritable bowel syndrome**
05/29/2012 15:30 EST  Wilson, CA DO

| | III | ICD-9 | 564.1 | 05/29/2012 | Current | 05/29/2012 |
|---|---|---|---|---|---|---|

**Dermatitis due to other specified cause**
11/10/2009 23:14 EST  Osagie, Anthony MLP

| | III | ICD-9 | 692.89 | 05/17/2009 | Current | 05/17/2009 |
|---|---|---|---|---|---|---|

05/17/2009 15:28 EST  Osagie, Anthony MLP

| | III | ICD-9 | 692.89 | 05/17/2009 | Current | 05/17/2009 |
|---|---|---|---|---|---|---|

**Osteoarthrosis, unspec, site unspecified**
01/07/2016 15:47 EST  Osagie, A. MLP

| | III | ICD-9 | 715.90 | 01/07/2016 | Current | 01/07/2016 |
|---|---|---|---|---|---|---|

| Reg #: 40637-053 | Inmate Name: AJAJ, AHMAD MOHAMMAD | | | | | |
|---|---|---|---|---|---|---|
| Description | | Axis | Code Type | Code | Diag. Date Status | Status Date |
| **Spinal stenosis, lumbar w neurogenic claudication** | | | | | | |
| 01/07/2016 15:45 EST  Osagie, A. MLP | | III | ICD-9 | 724.03 | 01/07/2016 Current | 01/07/2016 |
| **Chronic fatigue syndrome** | | | | | | |
| 06/13/2012 16:39 EST  Severn, D. DO | | III | ICD-9 | 780.71 | 06/13/2012 Current | 06/13/2012 |
| **LTBI Prophy Hx Prior to BOP Incarceration** | | | | | | |
| 04/05/2018 11:59 EST  Scully, Karen RN, IDC<br>Information transferred from SENTRY. | | III | ICD-10 | 795.5F | 1997 Current | 04/05/2018 |
| 03/12/2009 14:44 EST  Mitchell, Trish RN, IDC<br>Information transferred from SENTRY. | | III | ICD-9 | 795.5F | 1997 Resolved | 03/12/2009 |
| **Allergy, unspecified** | | | | | | |
| 01/27/2010 08:52 EST  Castillo, Fernando MLP | | III | ICD-9 | 995.3 | 03/04/2009 Current | 03/04/2009 |
| 03/04/2009 10:24 EST  Gladbach, Nona NP | | III | ICD-9 | 995.3 | 03/04/2009 Current | 03/04/2009 |
| **Unspecified Sleep-Wake Disorder** | | | | | | |
| 11/25/2014 15:04 EST  Erwin, Kate MD | | I | DSM-IV | G47.9 | 11/25/2014 Current | 11/25/2014 |
| **Sleep apnea** | | | | | | |
| 01/19/2018 13:16 EST  Khan, Aleem MLP | | | ICD-10 | G4730 | 01/19/2018 Current | |
| **Carpal tunnel syndrome** | | | | | | |
| 10/28/2016 11:03 EST  Oba, D. MD | | | ICD-10 | G5600 | 10/28/2016 Current | |
| **Polyneuropathy, unspecified** | | | | | | |
| 10/28/2016 11:03 EST  Oba, D. MD | | | ICD-10 | G629 | 10/28/2016 Current | |
| **Allergic rhinitis** | | | | | | |
| 09/07/2018 10:09 EST  Muscatell, Genevieve PA-C | | | ICD-10 | J309 | 09/07/2018 Current | |
| **Acute gingivitis, plaque induced** | | | | | | |
| 03/08/2017 12:48 EST  Burkley, T. DMD | | | ICD-10 | K0500 | 03/08/2017 Current | |
| **Gingival recession** | | | | | | |
| 08/10/2018 10:35 EST  Shepherd, Doug DMD | | | ICD-10 | K060 | 08/10/2018 Current | |
| **Partial loss of teeth** | | | | | | |
| 05/13/2016 15:45 EST  Haunschild, Terry DDS | | | ICD-10 | K08409 | 05/13/2016 Current | |
| **Diaphragmatic hernia** | | | | | | |
| 09/01/2017 13:40 EST  Choi, A. NP-C | | | ICD-10 | K449 | 09/01/2017 Current | |

| Reg #: 40637-053 | Inmate Name: AJAJ, AHMAD MOHAMMAD | | | | | |
|---|---|---|---|---|---|---|
| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
| Small to moderate Hiatal hernia per EGD on 3/6/2017 | | | | | | |

**Other cholelithiasis without obstruction**

| 08/07/2019 11:34 EST  Wood, B. PA-C | | ICD-10 | K8080 | 08/07/2019 | Current | |
|---|---|---|---|---|---|---|
| gallstones per US 3/4/19- multiple small sub cm gallstones near the neck of the gallbladder | | | | | | |

**Seborrheic dermatitis, unspecified**

| 05/14/2018 11:03 EST  Wilson, William E. MD/CD | | ICD-10 | L219 | 05/14/2018 | Current | |
|---|---|---|---|---|---|---|

**Dermatitis, unspecified**

| 03/16/2018 16:36 EST  Wilson, William E. MD/CD | | ICD-10 | L309 | 03/16/2018 | Current | |
|---|---|---|---|---|---|---|
| STASIS DERMATITIS | | | | | | |

**Cervicalgia**

| 10/28/2016 11:03 EST  Oba, D. MD | | ICD-10 | M542 | 10/28/2016 | Current | |
|---|---|---|---|---|---|---|

**Acquired absence of lung**

| 11/21/2013 14:14 EST  Camacho, R. MLP | III | ICD-9 | V45.76 | 11/02/2010 | Current | 11/21/2013 |
|---|---|---|---|---|---|---|
| S/P left pneumonectomy for bronchial carcinoid 1997. | | | | | | |
| 11/02/2010 13:42 EST  Szoke, David MD, CD | III | ICD-9 | V45.76 | 11/02/2010 | Current | 11/02/2010 |
| S/P left pneumonectomy for bronchial carcinoid 1997. | | | | | | |

# Remission

**Tricuspid valve disorders, spec as nonrheumatic**

| 01/07/2016 15:49 EST  Osagie, A. MLP | III | ICD-9 | 424.2 | 01/07/2016 | Remission | 01/07/2016 |
|---|---|---|---|---|---|---|

**Esophageal reflux**

| 12/04/2013 16:54 EST  King, Robert DO/NCR Mast Physician | III | ICD-9 | 530.81 | 05/29/2012 | Remission | 12/04/2013 |
|---|---|---|---|---|---|---|
| with OTC ranitidine | | | | | | |
| 05/29/2012 15:30 EST  Wilson, CA DO | III | ICD-9 | 530.81 | 05/29/2012 | Current | 05/29/2012 |
| grade 2 seen on EGD | | | | | | |

**Gastritis**

| 02/05/2018 16:53 EST  Lukens, David MD | III | ICD-9 | 535.50 | 05/29/2012 | Remission | 02/05/2018 |
|---|---|---|---|---|---|---|
| seen on EGD--MAR 03 2017 NORMAL exam. | | | | | | |
| 05/29/2012 15:30 EST  Wilson, CA DO | III | ICD-9 | 535.50 | 05/29/2012 | Current | 05/29/2012 |
| seen on EGD | | | | | | |

**Unspecified Depressive Disorder**

| 07/06/2017 12:29 EST  Kimble, N. PhD | I | DSM-IV | F32.9*b | 04/20/2015 | Remission | 07/06/2017 |
|---|---|---|---|---|---|---|
| 04/20/2015 11:40 EST  Kimble, N. PhD | I | DSM-IV | F32.9*b | 04/20/2015 | Current | 04/20/2015 |

Reg #:  40637-053                                    Inmate Name:  AJAJ, AHMAD MOHAMMAD

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| 09/01/2017 13:48 EST  Choi, A. NP-C | | ICD-10 | H6120 | 09/01/2017 | Current | |

**Disorder of teeth and supporting structures, unspecified**

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/13/2019 14:08 EST  Buschman, Brian MD | | ICD-10 | K089 | 11/07/2016 | Resolved | 02/13/2019 |
| 11/07/2016 12:01 EST  Ishteeaque, Saqib DMD | | ICD-10 | K089 | 11/07/2016 | Current | |

**Cellulitis, unspecified**

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/30/2017 14:12 EST  Rattan, S. MLP<br>   Folliculitis | | ICD-10 | L0390 | 11/02/2017 | Resolved | 11/30/2017 |
| 11/02/2017 15:33 EST  Rattan, S. MLP<br>   Folliculitis | | ICD-10 | L0390 | 11/02/2017 | Current | |

**Other muscle spasm**

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/13/2019 14:08 EST  Buschman, Brian MD | | ICD-10 | M62838 | 10/28/2016 | Resolved | 02/13/2019 |
| 10/28/2016 11:03 EST  Oba, D. MD | | ICD-10 | M62838 | 10/28/2016 | Current | |

**Pain, unspecified**

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/13/2019 14:08 EST  Buschman, Brian MD | | ICD-10 | R52 | 10/28/2016 | Resolved | 02/13/2019 |
| 10/28/2016 11:03 EST  Oba, D. MD | | ICD-10 | R52 | 10/28/2016 | Current | |

**Tuberculosis Exposure**

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/23/2016 07:20 EST  SYSTEM<br>   Information transferred from SENTRY. | III | ICD-9 | V01.1 | 1997 | Resolved | 03/12/2009 |
| 03/12/2009 14:44 EST  Mitchell, Trish RN, IDC<br>   Information transferred from SENTRY. | III | ICD-9 | V01.1 | 1997 | Resolved | 03/12/2009 |

**Acquired absence of lung**

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/23/2016 07:20 EST  SYSTEM<br>   benign carcinoid tumor removed 1998.<br>   duplicate entry | III | ICD-9 | V45.76 | 12/22/2008 | Resolved | 10/15/2013 |
| 10/15/2013 12:46 EST  Allred, D. DO<br>   benign carcinoid tumor removed 1998.<br>   duplicate entry | III | ICD-9 | V45.76 | 12/22/2008 | Resolved | 10/15/2013 |
| 12/22/2008 12:15 EST  Allred, David DO CD<br>   benign carcinoid tumor removed 1998. | III | ICD-9 | V45.76 | 12/22/2008 | Current | 12/22/2008 |

**Gen psych exam, see health prob list**

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/23/2017 17:03 EST  Sterett, Justin MD | III | ICD-9 | V70.2 | 03/01/2012 | Resolved | 01/23/2017 |
| 03/01/2012 15:02 EST  Lewis, D. DO | III | ICD-9 | V70.2 | 03/01/2012 | Current | 03/01/2012 |

**Observation for other spec suspected conditions**

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | V71.89 | 11/01/2011 | Resolved | 11/01/2011 |
| 11/01/2011 08:40 EST  Castillo, Fernando MLP | III | ICD-9 | V71.89 | 11/01/2011 | Resolved | 11/01/2011 |

**Observation for other spec suspected conditions**